

**FILED**

MAY 1 7 2007

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| IN THE MATTER OF APPEALS FROM ORDERS OF THE BANKRUPTCY COURT IN THE CASE OF TRI-STATE ETHANOL COMPANY, LLC, | \*<br>\*<br>\*<br>\*<br>\*<br>\* | CIV 06-1040, 06-1043, and 07-1003<br>**2007 D.S.D. 9**<br><br>ORDER AND OPINION |
| Debtor. | \*<br>\* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1]     The bankruptcy case of Tri-State Ethanol Company, LLC ("TSE"), debtor and the owner of a then defunct ethanol plant in South Dakota, has been ongoing since May of 2003. There are at least eleven matters pending on appeal. Ten appeals are brought by Tri-State Financial, LLC ("TSF"). Some of the orders may well be interlocutory and not appealable as a matter of right. TSF did not seek leave of court pursuant to 28 U.S.C. §158(a)(3) and claims the district court has jurisdiction pursuant to 28 U.S.C. §158(a)(1) ("final judgments, orders, and decrees"). No party has challenged jurisdiction. The court intends to consider and decide all pending appeals, if nothing else pursuant to §158(a)(3). I will deal with all these matters on appeal in an omnibus order and opinion since I am confident that an appeal will be taken from my order and opinion and I wish to burden the Court of Appeals with as few appeals as possible.

[¶2]     This court reviews the legal conclusions of the bankruptcy court *de novo*; findings of fact are upheld unless clearly erroneous. Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987) (*citations omitted*). Federal Rule of Bankruptcy Procedure, § 8013 provides as much and tells us that "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." A finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed, this despite the fact that there is some evidence to support the finding. Anderson v. City of Dessemer, 470 U.S. 564, 573 (1985), *citing* United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## RECUSAL OF BANKRUPTCY JUDGE

[¶3]    On June 30, 2006, TSF filed a motion for a United States Bankruptcy Judge to recuse from any additional proceedings in the bankruptcy case.  I will first deal with this matter.

[¶4]    28 U.S.C. § 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The question is whether the impartiality of the judge "might reasonably be questioned by the average person on the street who knows all of the relevant facts."  In re Kansas Public Retirement System, 85 F.3d 1353, 1358 (8th Cir. 1996) (citations omitted).  The existence of "actual bias" need not be shown. Moran v. Clarke, 296 F.3d 638, 648 (8th Cir. 2002) (*en banc*), *citing* Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 859-60, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).  28 U.S.C. § 455(b) provides that a judge "shall also disqualify himself . . . (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . ."

[¶5]    The impartiality of a judge is presumed to exist; a party seeking recusal bears a substantial burden to prove otherwise.  United States v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006), *citing* Lunde v. Helms, 29 F.3d 367, 370 (8th Cir.1994).  Whether to recuse is committed to the bankruptcy court's sound discretion.  Dossett v. First State Bank, 399 F.3d 940, 953 (8th Cir. 2005), *citing* Moran, 296 F.3d at 648.

[¶6]    The disqualification of a judge for personal bias or prejudice under 28 U.S.C. §455 is at least somewhat limited by the "extrajudicial source doctrine."  Liteky v. United States, 510 U.S. 540 (1994). "All of these grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses.  All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."  *Id*. at 556.  There is nothing in the record to even suggest bias stemming from any extrajudicial source.  Of course, any judge presiding in a given case reaches opinions about parties and counsel.  The bankruptcy judge readily concedes that he has done that here.  Reaching such opinions would especially be true when the case is so extremely

protracted and so bitterly fought at every stage as this case has been.  The judge reaches opinions about conduct and occasionally acts to prevent misconduct or miscarriages of justice. That is the nature of being a judge.  There is in this case no actual deep-seated antagonism. Nor is there any such antagonism that is "unequivocal."  At best, all comments are subtle and equivocal.  They are insufficient to show any degree of deep-seated antagonism.

[¶7]    TSF "must allege specific, non-conclusory facts showing a personal bias or prejudice against [it] that emanates from an extrajudicial source as distinguished from a judicial source, i.e. court proceedings."  United States v. Kirkpatrick, 2005 WL 2989314, *citing* Youn v. Track, Inc., 324 F.3d 409, 423 (6th Cir. 2003).  The essence of the complaints of TSF is that the opinions of the bankruptcy judge show a bias against TSF and one of its attorneys.  "Adverse judicial rulings, however, 'almost never' constitute a valid basis for recusal; the proper recourse for a dissatisfied litigant is appeal."  Dossett, 399 F.3d at 953, *citing* Liteky, 510 U.S. at 555.

[¶8]    The job of a trial judge is often frustrating, especially when counsel do not act in a professional manner.  We are dealing here with a non-jury proceeding.  There was no jury to listen to the judge speak about counsel or a party.  A judge must, as we all know, be especially careful in the presence of a jury to say and do nothing to influence the jury as to how to decide a case.  We know that judicial remarks and comments that are critical or disapproving, or even hostile to, a party or counsel, or to a party's case, ordinarily do not support a motion to disqualify a judge for personal bias or prejudice.  Liteky, 510 U.S. at 555.  In motions hearings or a trial to the court, most  judges do not sit like bumps on a log.  They express opinions, although in a preliminary fashion until the judge is ready to rule.  Judges often question where the lawyers and the parties are going and the arguments being made.  They are not required to listen to evidence that is "going nowhere."  It is helpful to lawyers to know what the judge is thinking, at least on a preliminary basis, so that the lawyer can correct the judge or change course to meet the questions being raised by the judge.  It is part of the process of "trying to get it right."

[¶9]    We know also that "even though §455 has no express timeliness requirements, claims under §455 will not be considered unless timely made."  In re Kansas Public Employees Retirement System, 85 F.3d at 1360, *citing* Holloway v. United States, 960 F.2d 1348 (8th

3

Cir.1992). In that case, a petition for a writ of mandamus (attempting to disqualify a federal judge) was untimely since it was filed more than one year after the petitioner first learned the claimed relevant facts underlying the motion. 85 F.3d at 1360-61. I will later discuss the timeliness factor in this case.

[¶10]   The bankruptcy judge denied the motion for recusal and issued a very lengthy memorandum opinion (117 pages). He sets forth the long history of motions and hearings and what has transpired in this case. The bankruptcy judge treated the motion for recusal very carefully and in great detail. That would be appropriate since no judge wants any litigant or spectator to reach the reasonable opinion that the judge has been unfair or is biased. A judge should be very careful to explain why recusal is not appropriate, assuming that is the case. The bankruptcy judge sets forth that he has been a trial court judge for more than 30 years, including over 18 years as a bankruptcy judge. He describes this case as "one of the more difficult ones over which he has presided, not because of its legal complexity but due to the sheer volume of contested matters and the animosity among major parties." I do not intend to repeat all the matters contained in the memorandum opinion of the bankruptcy judge. It is a very thorough and carefully set out opinion.

[¶11]   TSF has taken appeals from the order denying the motion to recuse. The appeals have been filed in CIV 06-1040, CIV 06-1043, and CIV. 07-1003. This is a belt and suspenders approach.

[¶12]   TSF has not only sought to require the recusal of the bankruptcy judge but has also alleged that the recently appointed bankruptcy judge in South Dakota should, at the outset, not be allowed to take over the case if the now retired bankruptcy judge is recused. TSF suggests that we need a bankruptcy judge from Iowa. This is a collateral gratuitous improper attack on the integrity and fairness of the recently appointed bankruptcy judge for the District of South Dakota. TSF has accused the now retired bankruptcy judge of twice lying, of conducting kangaroo court proceedings, of improperly giving documentary evidence to a bankruptcy judge from the District of Minnesota (also accusing the Minnesota judge of improperly looking at the documentary evidence), of disliking the principal investor in TSF because of his wealth and because he allegedly made unwanted sexual comments to a member of the judge's staff, of

4

disliking the *pro hac vice* TSF attorney, and attempting to put that attorney "in his place", given the fact that the attorney is a former bankruptcy judge from Nebraska.

[¶13]   TSF and its attorneys filed and endorsed an affidavit from a part time reporter for a weekly newspaper in Rosholt, S.D., the very small town in which the ethanol plant is located. TSF admits in a brief (page 10 of Doc. 59 in CIV 06-1040) that TSF procured the affidavit in question.  It is well known that most affidavits in every case are drafted by an attorney.  There is no doubt that TSF and its attorneys obtained this affidavit and used it in a filing with the bankruptcy court and again in the district court.  The affidavit is scandalous.  It states opinions and conclusions rather than facts.  It claims that the court proceedings "were an exercise in gamesmanship," that the bankruptcy judge's threat to continue hearings "bordered on blackmail", that the bankruptcy judge engaged in "legal gymnastics", that the judge was "favoring the Australians", that attorney Lovald (the trustee) and his attorney were acting improperly and were "only doing what the judge told them to do", that the proceedings were conducted as a "kangaroo court", and that unnamed people in Rosholt would be unhappy with the rulings of the bankruptcy judge.  TSF has thus also charged the trustee with unethical conduct and not fulfilling his independent obligations as an attorney but being, in effect, under the thumb of the bankruptcy judge.  TSF also charges that the trustee has violated his fiduciary responsibilities.  TSF has made the same accusations against one of the attorneys for the trustee, a well respected attorney and past president of the State Bar of South Dakota.  TSF has also challenged the award of fees to the attorney for the trustee, claiming that he had acted under a conflict of interest.  This matter of fees is a separate appeal which I will address later in this order and opinion.

[¶14]   The motion for recusal was filed in violation of local rules since it was not signed by local counsel for TSF.  It should have been denied on that basis alone.  The *pro hac vice* attorney and TSF continue to insist it was signed by local counsel.  It was filed electronically and shows only s/ before the typed name of the *pro hac vice* attorney.  The correct procedure was and is to show /s/.  There is no signature line for the then local counsel for TSF and no s/ or /s/ before the typed name of the local couinsel to meet the requirements of the local rules on electronic filing.  What the practices were at the time of the filing and what the requirements

5

have been since electronic filing was implemented in the District of South Dakota are now explained in D.S.D.LR 5.4 (although the entire version of all the new rules was not effective until March of 2007). In other words, the rule then is the same as the rule today. I have looked specifically at what was filed in BK 03-10194. The contentions of TSF and their attorneys are rejected. Many other filings by the TSF attorneys show that they were fully aware of the requirements for electronic signatures. I will nevertheless deal with the motion on its merits, as did the bankruptcy judge.

[¶15]   A former accountant for TSE and perhaps TSF, who was also a member of the board of managers of TSE, James Jandrain, through his attorney, joined in the motion for recusal. The history, in part, as to Mr. Jandrain, is set forth in paragraph 28 of the affidavit of the trustee. Mr. Jandrain has had significant conflicts of interest in sitting on the board of managers of TSE, then claiming to act at the same time as the corporate accountant, and acting on behalf of TSF as a member. Mr. Jandrain felt unfairly treated because his claim for more than $50,000.00 for claimed services as a certified public accountant for the debtor was rejected by the bankruptcy judge after a hearing. This action was the source of an earlier appeal to this court which I found to be without merit and which I remanded to the bankruptcy court.

[¶16]   ICM, Inc. and Randy Kramer (Kramer, at one time the president of TSE, now a member of TSF and thus hardly a disinterested person, is represented by an attorney who also represents James Jandrain) filed pro forma joinders in the motion for recusal. TSF filed objections to a settlement between the trustee and Murphy Brothers. The objection was based, at least in part, on the failure of the settlement to cause $82,996.00 to be paid to Randy Kramer. TSF is obviously representing or attempting to represent the interests of Randy Kramer.

[¶17]   TSF filed, in connection with the motion for recusal, a motion for leave for TSF to depose the trustee. This motion was referred by the bankruptcy judge (because the bankruptcy judge had not yet ruled on the recusal motion) to Robert Bankruptcy judge. Kressel, United States Bankruptcy Judge for the District of Minnesota. Judge Kressel denied the motion. TSF then filed a motion to reconsider both the order of the South Dakota bankruptcy judge referring the motion to Judge Kressel and the ruling of Judge Kressel on the motion. TSF, without doing any research, challenged the legal authority of Judge Kressel to act, ignoring the fact that

the Chief Judge of the United States Court of Appeals for the Eighth Circuit had, on December 7, 2005, entered an order designating Judge Kressel to act in connection with South Dakota bankruptcy matters. Judge Kressel denied the motion for reconsideration.

[¶18]   TSF has now filed in this court, among other things, an appeal from (1) the Order Transferring Case for Purpose of Ruling on Motion for Leave to Take Deposition, and (2) Order Denying Motion to take Deposition. These have been filed in the three civil files listed above.

[¶19]   The motion for reconsideration should not have been filed, in any event. TSF cited no authority which would permit, much less require, a reconsideration. The Federal Rules of Civil Procedure do not allow a "motion to reconsider." *See* Humphrey v. Roche Biomedical Laboratories, Inc., 990 F.2d 1078, 1081 (8th Cir. 1993), and In re Trout, 984 F.2d 977, 978 (8th Cir. 1993) (warning counsel that the Federal Rules of Civil Procedure do not provide for a motion for reconsideration and directing counsel to properly designate a motion under the rule authorizing the motion). The process of seeking reconsideration could be transformed into an endless chain of motions, filing a motion to reconsider the denial of the motion to reconsider, *ad infinitum*. As now Chief Judge Loken observed in his opinion in Wilkins v. Hartford Life and Accident Insur. Co., 299 F.3d 945, 948 (8th Cir. 2002): "Such motions (to reconsider) are frequently a futile waste of time for both the parties and the trial court." *See also* Broadway v. Norris, 193 F.3d 987, 990 (8th Cir. 1999) (Rule 60(b) motion is not for purpose of rearguing, somewhat more fully, merits of claim). I realize, of course, that the parties in a bankruptcy proceeding are governed largely by the Bankruptcy Rules, including Rule 9024 (which would not allow a motion for reconsideration of a motion dealing with a deposition and which refers to Fed.R.Civ.P. 60(b)). I believe the principles set forth above apply in bankruptcy proceedings.

[¶20]   The record is replete with the extreme and continuous litigiousness of TSF and its *pro hac vice* attorney. The various unauthorized motions for reconsideration are simply additional evidence of that.

[¶21]   As further evidence of improper conduct by TSF and its attorneys, TSF filed on September 11, 2006, what was called "Motion to Reconsider, Alter and/or (sic) Amend

Decision." I have already discussed the matter of motions to reconsider which are not authorized by any rule. In addition, attorney Strasheim filed the motion without the signature of local counsel, in violation of a local rule, 83.2(E). The South Dakota judge ordered the motion stricken from the record and denied it.

[¶22]   TSF has now also taken appeals from (1) Judge Kressel's Order Denying Motion to Reconsider, Set Aside, Alter and/or (sic) Amend Orders, (2) the South Dakota judge's Order Striking Motion to Reconsider, Alter and/or (sic) Amend Orders, and (3) the Order to set Deadlines. Appeals are pending in the three civil files described above.

[¶23]   An unsecured creditor, Eugene Paulson, filed his response in BK No. 03-10194, setting forth what he had observed about the conduct of John Hoich, the principal investor in TSF, and what he had observed about the part-time reporter for the Rosholt newspaper. Although filed beyond the deadline set by the bankruptcy judge. Mr. Paulson opposed the recusal motion and explained why.

[¶24]   The largest creditor, First Dakota National Bank ("First Dakota"), objected to the recusal motion, stating that " . . . TSF has been extraordinarily litigious, difficult to deal with and otherwise counterproductive throughout the Chapter 7 process." First Dakota points out how detrimental it would be to have the bankruptcy judge removed after presiding over this bankruptcy case for more than three years, that TSF has been treated fairly and in some instances, very favorably, by the judge, and that, of all the hundreds of creditors in this case, only TSF (and those in privity with TSF) think the judge should recuse. First Dakota concedes that the judge has often been frustrated by the continuous objections (even after rulings) and methods of operations of TSF and its attorneys. the bankruptcy judge has expressed on the record how frustrating it has been to preside over a case in which TSF and its attorneys have treated the judge and the other parties so poorly.

[¶25]   We know that TSF and the entity, American Prairie Construction Company, f/k/a North Central Construction, Inc., ("NCC") that built the ethanol plant in question, reached a settlement in the presence of the bankruptcy judge which was on the record in June of 2004. This was followed by TSF reneging on the settlement by adding terms not previously stated.

8

The bankruptcy judge did not enforce the settlement and allowed TSF to escape from it. Of course, this would be frustrating to any judge.

[¶26]   TSF and NCC later went to a mediation session before United States Magistrate Judge John Simko. Again, an oral settlement (on the record, however) was reached before Judge Simko in July of 2005. Judge Simko reported to the bankruptcy judge, as is the universal practice of Judge Simko, that a settlement had been reached by TSF and NCC, and the bankruptcy judge cancelled a hearing set for August 29, 2005. Again, TSF later backed away. The TSF attorney argued subject matter jurisdiction of the bankruptcy court to enforce any settlement and argued that he and TSF would not recognize the record made at the conclusion of the mediation session on July 26, 2005, as being the best record of the "core agreements" reached that day. I am unclear as to whether the claim is that the court reporter acted improperly or failed to "take down" what was said. In any event, the bankruptcy judge did not enforce this settlement as well and did not look at the transcript until it was unsealed.

[¶27]   TSF took another earlier appeal to this court on February 23, 2006. I dismissed that appeal on April 12, 2006, finding that the appeal was "totally without merit" and that I had no jurisdiction over the bankruptcy court's interlocutory order regarding the mediated settlement. The appeal of TSF to the district court was frivolous. TSF appealed my ruling to the United States Court of Appeals for the Eighth Circuit on April 27, 2006, and dismissed the appeal by motion on May 22, 2006. Such second appeal was also frivolous as a matter of law.

[¶28]   NCC has also opposed the motion to recuse. NCC points out that TSF ultimately settled with the trustee which settlement was approved by the bankruptcy judge. Only after such beneficial ruling did TSF file the recusal motion.

[¶29]   TSF makes much of the judge's strong criticism of TSF, its related parties, and others who had proceeded during the bankruptcy proceeding to retrofit the ethanol plant at considerable expense, all without court approval and, in fact, after the bankruptcy judge had refused on December 12, 2003, to approve the expenditures for the retrofitting. TSF, the debtor, and others conferred in private after the judge had refused to allow retrofitting (with TSF to receive a super priority status). These people made the decision to proceed without approval and actually in the face of disapproval. TSF and its present attorneys blame that

9

decision on the former lawyer for TSF.  TSF is, of course, responsible for what its lawyer does
or does not do.  Any judge would be bothered by parties and lawyers doing end runs on the
court and the court's previous rulings.  Yet the bankruptcy judge, prior to the recusal motion
being filed, approved a settlement with TSF that will result in the retrofitting expenses being
covered.  In short, TSF and its lawyers "got away" with the end run and have no valid
complaint about the matter.

[¶30]   The bankruptcy trustee also filed a lengthy objection to the motion for recusal.  In
support, the trustee filed a very detailed and comprehensive affidavit which rebuts point for
point the allegations of TSF and sets forth the protracted nature of the proceedings in
bankruptcy court.  The affidavit makes it clear that the unhappiness of TSF stems largely from
not being permitted by the trustee and the bankruptcy judge to be the sole bidder to buy the
ethanol plant.  Had the judge permitted this, there would have been great detriment to
unsecured and other creditors.  As a result of the actions of the judge and the trustee, it appears
that all creditors may be paid in full.

[¶31]   TSF argues, without any citation of authority, that the trustee is not an appellee and has
no standing in these appeals.  The claim of TSF that the trustee has no legitimate interest in
whether or not the bankruptcy judge is forced to recuse in a case that is now more than three
years old makes no sense.  Bringing in a new judge would greatly prolong the case and result
in much delay, all to the detriment of the creditors.  The trustee in his representative capacity
would be subject to great injury and would be aggrieved by what would result if TSF were to
be successful in its motion for recusal.  TSF argues that the trustee should have filed a notice of
appeal.  The question would be: appeal from what?  TSF also argues that the trustee should
have filed a notice of cross appeal.  The question would be: cross appeal from what?  I reject
the arguments of TSF as to the trustee.  The arguments and positions of the trustee are all a
matter of record in the bankruptcy court and nothing is added by what is filed in the district
court.

[¶32]   The trustee sets forth in paragraph 30 of the affidavit that TSF "continues to file
multiple objections in an attempt to delay the Chapter 7 Estate in making an ultimate
distribution to unsecured creditors in this case."  That is no doubt true.  It is no doubt true that

10

TSF objects to virtually everything in the bankruptcy court and appeals virtually every ruling of the bankruptcy court to the district court. Of course, any party has the right to appeal to a higher court but this does not permit objections or appeals which are frivolous.

[¶33]   The trustee calls some of TSF's comments in connection with the recusal motion "reckless and misleading." He calls TSF suggestions "a red herring." He states that TSF "has every intention of delaying the administration of this estate for the foreseeable future." I agree. The record reflects this and there can be no other logical explanation for the actions of TSF and its attorneys.

[¶34]   The trustee reached a settlement agreement (subject to court approval) with NCC. TSF has objected to that and a contested hearing will be required and perhaps already has been conducted by the retired bankruptcy judge.

[¶35]   Trustee Lovald states in his affidavit that TSF "has been and continues to be engaged in a bitter vendetta with this creditor (i.e. NCC) and appears to want to use the estate, and the estate's resources, to continue the dispute unabated. That course of action could tie up the estate for years to come, and substantially reduce the estate's cash, because of the priority position held by North Central Construction." The trustee also states under oath: "Trustee respectfully submits that the Motion for Recusal submitted by Tri-State Financial is nothing more than a thinly veiled and stale attempt to judge shop in an attempt to dominate and control all decisions in the administration of this case, and to hijack the estate's limited resources to engage in endless litigation with North Central Construction, and should be summarily denied."

[¶36]   TSF attempts to rely on United States v. Pfizer, Inc., 560 F.2d 319 (8th Cir. 1977), a case in which a then United States District Judge in Minnesota decided to force the parties into a trial to the court based upon his belief that the case was too complicated for a jury trial. He did so after forming strong opinions and after actively and aggressively attempting to force the parties to settle. He even expressed his opinion before the scheduled trial on the monetary value of the claims. In the present case, the bankruptcy judge took no part in the settlement discussions or the expressions by the parties, including TSF, that a settlement had been reached. He naturally was displeased when the parties claimed (once in the presence of the

11

bankruptcy judge and once in the presence of Judge Simko) to have reached a settlement, only to then have the "settlement" fall apart twice. Delays and confusion were caused by these activities and no judge appreciates such diversions. Pfizer has no relevance to the case now before this court.

[¶37]   I will return to the issue of timeliness of the recusal motion. The complaints of TSF stem largely from the judge's decision to convert this case from a Chapter 11 case to a Chapter 7 case in July of 2004 and the manner in which the bidding process (to sell the ethanol plant) was conducted in October of 2004. These actions took place more than 20 months before the recusal motion was filed. TSF knew long ago that the judge was very unhappy about what had transpired as to the unauthorized retrofitting of the plant. He was unhappy about the insider machinations between and among TSE, TSF and others. He was unhappy with the conduct of TSF officials and its attorneys during the bankruptcy proceedings. The bankruptcy judge thought the credibility of witnesses presented by TSF was poor. Any judge has the right to reach those opinions. TSF knew about all these matters long ago. They certainly knew about them on July 28, 2004, by their own admission. The TSF complaints about the comments of the bankruptcy judge on May 4, 2006, that, although he was retiring, he intended to retain this case, are much ado about nothing and are no evidence of bias or perceived bias. There is no evidence that the comments were addressed to anyone in particular. The motion is, as a matter of law, untimely, at least as to perceived bias. On the basis of untimeliness alone, the ruling of the bankruptcy judge on the recusal motion should be affirmed.

[¶38]   In addition, I agree with all the sworn statements of trustee Lovald as set forth above and the record fully supports the statements. I find and conclude that, based on the record before the court, the recusal motion was not made in good faith but for the improper purpose of further delay and harassment of the trustee, other attorneys, creditors, and the judges. I find and conclude that the impartiality of the bankruptcy judge may not be "reasonably" questioned. Nor would the average person "on the street" who knows all the facts reasonably question such impartiality.

[¶39]   TSF complains that the bankruptcy judge asked for views of counsel as to whether he should recuse. There is no evidence of this and TSF cites to no portion of the record to support

the claim.  The judge did set a deadline for joinders and other responses.  TSF's allies took advantage of that and filed joinders.  I agree that a judge considering recusal should not ask for the views of the attorneys, at least unless there is a procedure for responses to be filed which are not available to the judge.  Again, there is no evidence that the judge did anything other than allowing responses and joinders.  If there was any error, it was harmless.

[¶40]   I find and conclude that the bankruptcy judge acted properly and objectively within his discretion in deciding to deny the motion to recuse.  His order of September 1, 2006, should be affirmed.  This will cover the appeals of this issue in CIV 06-1040, CIV 06-1043, and CIV 07-1003.

[¶41]   TSF and its attorneys have pursued the same course of conduct (displayed in the bankruptcy court) in the district court.  In their initial brief, they filed an over length brief in violation of then D.S.D.LR 7.2(B).  The brief also was filed in violation of the professional obligations of members of the bar.  It contained scandalous material filled with many scurrilous accusations against the bankruptcy judge, other judges, and attorneys involved in this case.  I ordered the brief stricken and to be filed under seal to facilitate appellate review.  I filed an extensive order and opinion (Doc. 37 in CIV 06-1040) which I incorporate by reference in this Order and Opinion.  The brief (Doc.10-1 in CIV 06-1040) illustrates the methods of operation employed by the *pro hac vice* attorney  and his client in this entire matter.  As I have at least intimated earlier, I have never seen anything like it in all the years I have been admitted to practice (since 1962).

[¶42]   I filed another Order and Opinion (Doc. 45 in CIV 06-1040) on February 2, 2007.  I ruled on a TSF motion (Doc. 21 in CIV 06-1043, no comparable motion having been filed in CIV 06-1040).  I set forth in such Order and Opinion that counsel for TSF were trying to "set up" the district court by filing a motion asking the court to direct what material could be included in a TSF brief covering one of the issues on appeal.  Of course, no responsible judge would do anything of the kind.  I also set forth that counsel for TSF had engaged in "a blatant misstatement of the record."  I continue to adhere to that finding and conclusion.

[¶43]   To further show the depths to which this case has sunk, the trustee filed motions to disqualify the *pro hac vice* counsel in these various cases.  The trustee also filed motions

13

seeking an award of attorney fees and costs against this attorney for the claimed misconduct of the TSF attorneys.  On April 23, 2007, I entered an Order and Opinion (Doc. 60 in CIV 06-1040 and Doc. 52 in CIV 06-1043) referring what I believed was a request for disciplinary action to Chief Judge Schreier.  The referral was pursuant to D.S.D.LR 83.2(G)(2).  This includes the motions to disqualify and the motions for sanctions.  I have never previously seen a motion seeking to remove *pro hac vice* counsel from participation in a case.

[¶44]   The Nebraska attorney through a South Dakota attorney (who has since been replaced as local counsel) sought *pro hac vice* admission in another case (CIV 07-1003) and I have not granted the motion.  The non-admitted attorney once again signed the notice of appeal (as he has done in all the other appeals) although he had not at the time of signing been admitted to practice.  These actions would be additional violations of the rules of practice.

## APPEALS FROM SIX OTHER BANKRUPTCY COURT ORDERS

[¶45]   I will turn now to the appeals of TSF from another six interlocutory orders.  The notice of appeal (Doc. 1) in CIV. 07-1003 describes them.  Appeals are also taken from the same six other interlocutory orders in CIV 06-1040 and CIV 06-1043.

[¶46]   All appeals of the Order Transferring Case for Purpose of Ruling on Motion for Leave to Take Deposition are entirely frivolous, as I have discussed previously in this opinion.  The bankruptcy judge had the authority to transfer the pending motion and Judge Kressel had the authority to rule on the motion and did so.  Such Order should be affirmed.

[¶47]   All appeals of the Order Denying Motion to Take Deposition (of the trustee) should be rejected as clearly within the discretion of Judge Kressel, which discretion was properly exercised.  The record here is more than complete.  Taking the deposition of attorney and trustee Lovald would have been nothing but a source for more indigestion and bad blood between counsel.  The Order should be affirmed.  TSF attempts to broaden the issue before the court to include the claimed "right to discovery."  Nothing was before the bankruptcy court other than a request to be permitted to depose the trustee.  That is the issue before this court on appeal.

[¶48]   All appeals of the Order Denying Motion to Reconsider, Set Aside, Alter and/or (sic) Amend Orders are entirely frivolous, not permitted by either the bankruptcy rules or the Federal Rules of Civil Procedure, and the Order entered by Judge Kressel should be affirmed.

[¶49]   All appeals of the Order Striking Motion to Reconsider, Set Aside, Alter and/or (sic) Amend Orders are also frivolous, the motion having been made in violation of local rules (i.e. not signed by local counsel), not permitted by either the bankruptcy rules or the Federal Rules of Civil Procedure, and the Order should be affirmed.

[¶50]   All appeals of the Order to Set Deadlines are also clearly within the discretion of the bankruptcy judge which discretion was properly exercised; the Order should be affirmed.

### APPEAL FROM ORDER APPROVING FEES OF TRUSTEE'S ATTORNEY

[¶51]   I turn next to what is yet to be decided in CIV 06-1040.  Although the notice of appeal includes all orders described above, it also deals with an appeal by TSF of an order of the bankruptcy court approving an application for fees and expenses to the attorney representing the trustee.  Once again, the Nebraska attorney signed the notice of appeal without being admitted *pro hac vice* in this case.  It would seem to be elementary to not do so.  TSF filed a 53 page brief, in violation of the local rules which permit only 25 pages unless authorized in advance by the judge.  Among other things, TSF alleged that the judge should not, apparently because of the motion for recusal, have ruled on the fee application of the trustee's attorney.  In the alternative, TSF alleges that the application for fees should have been denied.  TSF alleges that the appointment of the attorney by the bankruptcy judge was invalid, that the attorney had a conflict of interest in representing an interest adverse to the Chapter 7 estate, that the attorney lacked candor and failed to make a complete disclosure, that the trustee and his attorney knew of the conflict and ignored it, that the alleged waiver of the conflict by the trustee and the attorney (which would seem to fly in the face of the allegation that the trustee and the attorney ignored the conflict) was of no legal effect, and numerous other allegations.  The essence of the TSF claim is that the attorney for the trustee represented the Clapper Corporation which held a disputed claim of $195,929.43 at the same time that the attorney represented the trustee.  An amended claim was later filed, reducing the Clapper claim to $95,630.29.  TSF objected to the claim for fees and costs on the same day TSF filed the

15

recusal motion.  The bankruptcy judge overruled the TSF objections and approved the fee application.

[¶52]   The TSF brief includes a great deal of material having absolutely no relevance to the fee application questions.  The brief moves back and forth from one subject to another.  The brief attempts to raise unrelated claims on behalf of ICM (who allegedly was forced by the judge to buckle under), James Jandrain, TSE, and Randy Kramer.  The TSF attorney attempts several times to become a witness in the brief.  TSF rehashes in extensive detail what took place in connection with the efforts to sell the ethanol plant, setting forth that TSF paid $27,900,000.00 for the TSE assets and complains that TSF paid too much.  That would seem to be a benefit to the creditors.  If TSF paid "too much" pursuant to a settlement, this is not something that can be rectified by this court.  All of this, in any event, took place in 2004, a long time ago.  TSF raises numerous non-issues which pre-dated the settlement reached by TSF with the trustee. The settlement by the parties moots the complaints of TSF about the process that took place before the settlement.

[¶53]   On August 3, 2004, the trustee filed an application to employ the attorney in question and another attorney from his law firm.  The application disclosed that the attorney in question "is counsel for unsecured creditor Clapper Corporation."  A claim had been filed by Clapper when this was a Chapter 11 proceeding.  Not until the case was converted to Chapter 7 did the trustee approach the attorney about representing the trustee.

[¶54]   TSF complains that there was no disclosure of waivers of the conflict of interest.  If TSF had some questions about that matter, it should have raised them in 2004, not in late 2006. If TSF was concerned, TSF should have objected to the initial appointment of the attorney but did not do so.  Of course, anyone would anticipate that any actual conflicts of interest would be waived or the attorney could not proceed.  11 U.S.C. § 327(c) provides that a person is not disqualified for employment by the trustee "solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

16

[¶55]   Clearly, the appointment of the attorney by the bankruptcy judge was proper under the facts and the law.  The initial disclosure by the attorney was entirely proper and sufficient. Again, the finding by the bankruptcy judge as to these matters is not clearly erroneous.  In fact, it is not erroneous.

[¶56]   The trustee later independently contested at least one of the Clapper claims and the dispute is apparently not resolved.  The attorney in question did not know that the Clapper claims (one of which arose during the course of the bankruptcy proceeding) would be challenged until long after he was appointed to represent the trustee.  The trustee also did not anticipate any actual conflict of interest when the attorney was appointed.  The findings of the bankruptcy judge to this effect are not clearly erroneous.  The trustee has since employed independent counsel to challenge at least one of the Clapper claims.  The attorney in question has at no time represented the bankruptcy estate in connection with the Clapper claims.

[¶57]   It is clear that no harm has occurred to anyone at this juncture.  Certainly no financial harm has occurred to anyone.  This includes TSF.  The trustee and his attorney could have perhaps been more careful when it appeared that an actual conflict of interest had developed, bringing it to the specific attention of the bankruptcy judge and the other parties.  This, however, is not sufficient to deny the attorney the compensation to which he is clearly entitled.

[¶58]   There is no evidence that the trustee or his attorney should have been able to anticipate an actual later dispute over the Clapper claim.  There is  no justification for TSF raising no questions or objections until after the attorney had performed valuable services for the trustee. TSF has "laid in the weeds" and it would be highly inequitable to punish the trustee's attorney in the manner sought by TSF.  TSF admits that the attorney "performed a wide range of services" for the trustee, including representing the trustee in the "sale and disposition of the assets of TSE and in opposing some claims and paying some claims." TSF does not deny that the fees are reasonable, the sole objection being the result of the conflict of interest.  TSF in fact relied on the attorney to present the settlement (between TSF and the trustee) to the bankruptcy judge and obtain his approval.  The objections to the fees of the attorney and the appeal of the matter only further demonstrate the "bad blood" that exists throughout this

bankruptcy case. The order of the bankruptcy judge approving the fees on October 19, 2006, should be affirmed.

## APPEAL AND CROSS APPEAL AS TO PREPAYMENT PENALTY

[¶59]   TSF has appealed from the bankruptcy court's decision to allow the recovery by First Dakota National Bank ("First Dakota") of a prepayment penalty of $173,253.27 plus interest from May 23, 2003, until paid, from the bankruptcy estate as a pre-petition liability, i.e. existing prior to the bankruptcy filing on May 23, 2003. The bankruptcy court thus held that the prepayment penalty was due First Dakota as a component of the secured claim of First Dakota, this pursuant to 11 U.S.C. § 502(b). First Dakota had sought by motion the payment of the prepayment penalty (2% of the remaining balance on the loan) as a post-petition liability of the estate, this pursuant to 11 U.S.C. § 506(b). Both TSF and the trustee objected to the motion. TSF claims that the bankruptcy judge  could not rule in favor of First Dakota on a theory not advanced by the debtor. That contention should be rejected. While it is true that the bankruptcy court awarded relief to First Dakota, not under the relief sought by First Dakota (11 U.S.C. § 506(b) but under 11 U.S.C. § 502(b), the bankruptcy judge acted within his discretion in deciding a case based on an issue not raised by a party.

[¶60]   First Dakota filed a cross appeal to this court from the ruling that denied it recovery under 11 U.S.C.§ 506(b). Obviously, First Dakota does not seek a double recovery of the prepayment penalty but filed the cross appeal to protect its rights. There are fundamental differences between 11 U.S.C. § 506(b) and § 502(b). Federal law and not state law determines what may be recovered under § 506(b). In re Schriock Construction, Inc., 104 F.3d 200, 202-03 (8th Cir. 1997). By contrast, under § 502(b)(1), pre-petition claims must be disallowed if unenforceable under state law. It is not surprising that First Dakota would choose to proceed under § 506(b).

[¶61]   The debtor, TSE, had defaulted on loan payments due First Dakota. On May 16, 2003, First Dakota filed an action in state court to foreclose its mortgage on the TSE ethanol plant. First Dakota alleged that it had accelerated the amounts owing on two notes and that the "entire principal, accrued interest, and other amounts owed" First Dakota "was immediately due and payable." No allegations were specifically made about

18

any prepayment penalty being claimed or sought.  The general allegations, however, would clearly be sufficient under the modern rules of pleading.

[¶62]   As previously stated, TSE filed a Chapter 11 bankruptcy case on May 23, 2003.  On July 29, 2004, the case was converted to a Chapter 7 case.  The trustee sold the ethanol plant in 2005.  Pursuant to a bankruptcy court order of February 15, 2005, the trustee paid First Dakota from the sale proceeds all principal, interest to the date of payment, and most of the attorney's fees and costs owing on the two notes.  The trustee did not pay the First Dakota claimed prepayment penalty or attorney fees associated with the prepayment penalty.

[¶63]   The business loan agreement ("BLE") entered into by TSE and First Dakota on May 14, 2001, provides, in part: "B) Prepayment.  A prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan in excess of the aforementioned free cash flow."  As the bankruptcy judge noted in his opinion, this is not a sentence.  It is found under this section: "NEGATIVE COVENANTS.  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:"

[¶64]   There is a large section of the BLE dealing with "DEFAULT."  Nothing is mentioned in that section as to any required prepayment penalty in the event of default.  There is a very large section of the BLE dealing with "DEFINITIONS."  There is no definition of "prepayment."  The BLE clearly provides that it is governed by the laws of the State of South Dakota.

[¶65]   A promissory note for $9 million was executed that same day and the loan was made.  Payment in full was required on February 14, 2002.  One of the provisions of that note was: "PREPAYMENT: MINIMUM INTEREST CHARGE . . . In any event, even upon full prepayment of this note, Borrower understands that Lender is entitled to a minimum interest charge of $50.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due" (emphasis supplied).

[¶66]   The note also provided: "LENDER'S RIGHTS.  Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount" (emphasis supplied).  There can be no doubt that "that amount" would be the unpaid principal and all then accrued unpaid interest.  Nothing was provided about the prepayment charge also being due or included within "that amount."  If that was the intent of the parties, it would have been simple to say so.

[¶67]   There is no ambiguity in these provisions of the note.  The language is clear.  Parole evidence would not be admissible and should not have been admitted by the bankruptcy court.

[¶68]   Next, there was a loan modification agreement dated February 6, 2002.  The maturity of the promissory note of May 14, 2001, was extended until March 15, 2002.  The principal balance is recited to be $8,417,089.97.  The modification agreement recites: "This loan will have a 2% prepay if paid from proceeds other than by renewal with a First Dakota term loan."

[¶69]   It is obvious that this last-quoted provision has no legal effect because, on March 15, 2002, a replacement promissory note was executed and delivered.  This shows the debt at $9 million and the maturity date became March 1, 2012.  This final version of the note (and the note which must be used, at least in part, to answer the questions here) provided for 117 monthly consecutive principal and interest payments of $117,700.00 each, beginning June 1, 2002, with interest at 9.500% per annum, and one principal and interest payment of $118,336.20 on March 1, 2012, with interest calculated on the unpaid principal balances at an interest rate of 9.500% per annum.

[¶70]   The replacement note provided, as did the previous version: "PREPAYMENT: MINIMUM INTEREST CHARGE . . . In any event, even upon full prepayment of this note, Borrower understands that Lender is entitled to a minimum interest charge of $50.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due" (emphasis supplied).

20

[¶71]   The replacement note also provided: "LENDER'S RIGHTS.  Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount" (emphasis supplied).  There can be no doubt that "that amount" would be the unpaid principal and all then accrued unpaid interest. Nothing was provided about the prepayment charge also being due or included within "that amount."  If that was the intent of the parties, it would have been simple to say so.  There is no ambiguity in this provision of the note.  The language is clear.

[¶72]   The new note also provided: "PREPAYMENT PROVISION.  A prepayment charge of 2% on any unscheduled principal payments for the first seven years of the term loan, in excess of the free cash flow.  Free cash flow is defined in the Business Loan Agreement dated May 14, 2001."  Nothing was provided about the prepayment charge applying in the case of the mortgagee choosing to accelerate the loan to force a pay-off of the loan and all interest.  If that was the intention of the mortgagee, it would have been easy to say so.  The note again provides that it is governed by the laws of the State of South Dakota.

[¶73]   A promissory note was also executed and delivered to First Dakota on November 20, 2002, the consideration being a loan of $600,000.00.  This note contains the same language described in the earlier notes under "PREPAYMENT: MINIMUM INTEREST CHARGE" and "LENDER'S RIGHTS."  There is no provision in this note dealing with any prepayment charge of 2%.  Again, the note is said to be governed by South Dakota law.  There is no mention whatsoever of any prepayment penalty.

[¶74]   Mortgages secured the loans.  Nothing in the mortgage addresses what is to happen upon a prepayment of the debt.  However, one provision of the mortgage of March 15, 2002, is as follows: "Accelerate Indebtedness.  Lender shall have the right at its option without notice to Grantor to declare the entire indebtedness immediately due and payable, including any prepayment penalty, which Grantor would be required to pay" (emphasis supplied).  The language does not specifically and clearly require the payment of the prepayment penalty.  The reference could well be read to require looking at other documents to see whether there is in fact "any prepayment penalty which Grantor would be required to pay."  The language could well be read to require an examination of South Dakota law to determine whether a prepayment

21

penalty could be required upon First Dakota declaring the entire indebtedness immediately due and payable. The language is ambiguous and poorly written. I respectfully disagree with the conclusion of the bankruptcy court that the default language in the mortgage "clearly contemplates" that the prepayment penalty would become due upon acceleration of the debt. I reach the opposite conclusion.

[¶75]   Compare, e.g., the language found in an instrument of debt described in In re Ridgewood Apartments of DeKalb County, Ltd., 174 B.R. 712, 721 (Bktcy. S.D. Ohio 1994): "Borrower shall pay the prepayment premium due . . . whether the prepayment is voluntary or involuntary (in connection with Lender's acceleration of the unpaid principal balance of the Note) or the Instrument is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means."

[¶76]   There are other problems. The note constitutes the debt. It is elementary that the mortgage secures the note. In the absence of the note, there is no consideration for the mortgage. All of this is elementary. It is possible, despite the ambiguity discussed above, that the mortgage provides for one thing as to the prepayment penalty and the promissory notes do not. In this sense, there is also ambiguity. The bankruptcy court received no evidence as to the intent of the parties other than the intent as to the prepayment penalty. The bankruptcy court received no evidence and made no findings as to any claimed intent of the parties as to whether, assuming the prepayment penalty exists in the abstract, such a penalty was to be applied upon First Dakota accelerating the debt, demanding full payment of all principal and interest due. What the intention of the parties may have been (assuming that any such evidence was admissible, given the clear provisions of the promissory notes) as to a prepayment penalty in the abstract is entirely immaterial. No evidence was received nor was anything decided below about possible unconscionability of the prepayment penalty in the event of the lender accelerating the debt. Ambiguities are construed against the drafter of the instruments, in this case First Dakota. In the normal course, the court would look at the mortgage and the note as one transaction and construe them together. The notes do not contain any provision incorporating the terms of the mortgage by reference.

[¶77]   "The generally accepted rule is stated in 55 Am.Jur.2d Mortgages, §176, at 303, 304 (1971): Although there is contrary authority, it is a widely accepted general rule that a mortgage or deed of trust and a note or bond secured by it are to be deemed parts of one transaction and construed together as such; the provisions of both should be given effect, if possible, and the intention of the parties as determined from an examination of both, not from one separately, must prevail . . . Where, however, there is an irreconcilable difference between notes or bonds and mortgages or deeds of trust given to secure them, the former control." Ferguson v. Peoples Nat'l. Bank, 800 SW2d 181, 183 (Tenn 1990).

[¶78]   "Generally, the provisions of a promissory note and a mortgage given to secure payment of the note must be construed together whenever possible." First Interstate Bank, N.A. v. Rebarchek, 511 NW2d 235, 241 (ND 1994), *citing* Lakeland Realty Co. of Minnesota v. Reese, 46 NW2d 696 (N.D. 1951), and Interstate Finance Corporation v. Brink, 6 NW2d 120 (Iowa 1942). "However, when there is an irreconcilable conflict between the terms of the note and mortgage as to maturity, the terms of the note must prevail because the note is the principal obligation and the mortgage only incidental to it." (citing cases) *Id.*

[¶79]   The question then becomes: is there irreconcilable conflict between the terms of the promissory notes and the mortgage?  This is not a situation where the note is simply silent on an issue and the mortgage clearly covers the issue.  I find that there is irreconcilable conflict between the note and the mortgage, both executed on March 15, 2002, as to whether an acceleration necessarily results in the prepayment charge becoming due.  The note unambiguously allows prepayment with no penalty.  The mortgage perhaps, in a very ambiguous fashion, allows the prepayment penalty.  The provisions of the note then govern. The bankruptcy court erroneously concluded that the language in the First Dakota mortgage (as ambiguous and poorly written as it is) would, in effect, trump the language in the promissory notes to the contrary.

[¶80]   What would have happened in the foreclosure action had TSE not filed for bankruptcy? A complaint seeking to foreclose a mortgage is unquestionably an equitable action.  *See* First W. Bank, Sturgis v. Livestock Yards, 466 NW2d 853, 856 (SD 1991), which case cites Lounsberry v. Kelly, 142 NW 180, on reh'g 143 NW 369 (SD 1913).  "Foreclosure of a

23

mortgage is an equitable action and a court in equity has the power and the right to grant full and complete legal and equitable relief." American Fed. Sav. v. Mid-America Service, 329 NW2d 124, 126 (SD 1983) (*citing cases*). This principle of law was endorsed again in Alma Group, LLC v. Weiss, 2000 SD 108, 616 NW2d 96. The question is, in part: would a South Dakota court of equity require the mortgagor to pay a prepayment penalty where the mortgagee has exercised the option to declare the entire balance due and payable at once? I believe the answer would be "no." It would certainly be "no" under the facts of the present case.

[¶81]   I respectfully disagree with the attempt of the bankruptcy court to distinguish American Savings & Loan Association v. Mid-America Service Corp., 329 NW2d 124 (SD 1983). I find and conclude that this case clearly states the public policy of the State of South Dakota, especially under the facts of the present case. This is despite the fact that the American Savings case is not "on all fours" with the present case. This is of no consequence since broad principles are stated in American Savings. In short, when the lender chooses to accelerate, there is no prepayment and a prepayment penalty may not be applied. The South Dakota Supreme Court relied, in part, on Slevin Container Corp. v. Provident Federal Savings & Loan Assoc., 424 NE2d 939 (Ill.App.1981). "We believe that where the discretion to accelerate the maturity of the obligation is that of the obligee, the exercise of the election renders the payment made pursuant to the election one made after maturity and by definition not prepayment." Slevin, 424 NE2d 941.

[¶82]   The attempt to distinguish American Savings based on the fact that a due on sale clause was there involved must fail. As the South Dakota Supreme Court noted, Slevin did not involve a due on sale clause. *See* FN 4 which quotes from Slevin (424 NE2d at 940-41) to the effect "that where acceleration of an obligation is the result of nonpayment by the obligor the election to so accelerate is binding and may not be revoked in order to charge and collect a prepayment penalty."

[¶83]   The facts in the present case are "stronger" than in American Savings where the notes themselves contained the prepayment penalty language. The facts as to equities are even stronger in the present case. What the bankruptcy court did was to order the payment of all principal due, all interest due on the principal, the prepayment penalty, and interest on the

24

prepayment penalty. This is in the nature of at least a double recovery and the South Dakota Supreme Court would not find such to be equitable. I also see nothing in the promissory notes authorizing interest to be collected on the prepayment penalty.

[¶84] I agree with the holding of the bankruptcy court that the claim for the prepayment penalty arose, if at all, when the notice of acceleration was given. It was pre-petition. The provision of the mortgage dealing with First Dakota having the right to declare the entire indebtedness immediately due and payable would include "any prepayment penalty which Grantor would be required to pay." In other words, it was then or never. I find that it was "never" but the claimed prepayment penalty was, by virtue of the language of the mortgage, linked to the notice of acceleration. There is no language anywhere possibly tying a prepayment penalty to anything other than the acceleration. No prepayment penalty is even suggested by virtue of the debtor filing for bankruptcy, First Dakota presenting claims in the bankruptcy court, or upon a sale of the secured property. Thus, any possible recovery by First Dakota must stem from 11 U.S.C. § 502(b). It cannot stem from 11 U.S.C. § 506(b) and the bankruptcy court should be affirmed in that regard. In addition, any prepayment penalty, in the language of 11 U.S.C. § 506(b), is not "provided for under the agreement under which such claim arose." The claim, if any, would arise under the promissory notes and does not. No party has briefed or raised any possible issue as to the effect of all contracts requiring the application of South Dakota law and the effect, if any, that this would have on 11 U.S.C. § 506(b), assuming that any recovery could be made under that section. The cross appeal of First Dakota should be denied. What can and cannot be recovered under 11 U.S.C. § 506(b) is not relevant in this case.

[¶85] The bankruptcy court did not address the question of the definition of "prepayment." No definition of the word was contained in any of the documents. As I have discussed above, I believe the South Dakota Supreme Court has told us very clearly that paying under an acceleration by the lender is not as a matter of law a "prepayment." South Dakota is not alone in so holding. In Matter of LHD Realty Corp., 726 F.2d 327, 330 (7th Cir.1984), the court held that the lender lost its right to a prepayment premium by electing to accelerate the debt. "This is so because acceleration, by definition, advances the maturity date of the debt, so that

25

payment thereafter is not prepayment but instead is payment made after maturity." *Id.* In Zwayer v. Ford Motor Credit Co., 665 NE2d 843 (Ill. App. 1 Dist. 1996), the court agreed with the holding in Slevin. Defendant had claimed that acceleration is a form of prepayment and the court rejected the argument, holding that payment pursuant to acceleration of the maturity date by the lender is, by definition, not a prepayment. *Id.* at 846. In Garza v. Chicago Health Clubs, Inc., 347 F.Supp. 955, 962 (N.D. Ill. 1972), the court held that, for purposes of the Illinois Retail Installment Sales Act, "acceleration of the debt does not constitute 'prepayment' . . . because of the ordinary meaning of the word . . ." The payment of a debt after acceleration is not a prepayment and the creditor is therefore not entitled to recover any prepayment penalty provided for in the note. *See* Texas Airfinance Corp. v. Lesikar, 777 SW2d 559, 563 (Tex. App. Houston 14th Dis. 1989) and George H. Nutman, Inc. v. Aetna Business Credit, Inc., 453 N.Y.S.2d 586, 587, 115 Misc.2d 168, 169 (1982).

[¶86]   Given the ruling of the court, there is no need to reach the "free cash flow" arguments advanced by TSF.  There is also no need to address the TSF arguments about the prepayment penalty being void under South Dakota law because of its nature as liquidated damages. Finally, there is no need to address the TSF argument that First Dakota, by accepting payment under 11 U.S.C. § 502(b) of all principal, all interest, the prepayment penalty, and more than $80,000.00 in interest on the prepayment penalty, has waived any right to its cross appeal and its claim that the bankruptcy court should have awarded relief under 11 U.S.C. § 506(b).  The parties argue about the question of reasonableness.  This, of course, would be relevant only under 11 U.S.C. § 506(b) (except perhaps in connection with an equitable look at what would be permitted in the foreclosure action).  I do note in passing the following South Dakota statute dealing with Savings and Loan Associations: "Any real estate loan may be prepaid in part or in full, at any time, and the association shall not charge for such privilege of anticipatory payment an amount greater than one and one-half percent of the amount of such anticipatory payment." SDCL 52-8-8.

[¶87]   The bankruptcy court should be reversed as to the prepayment penalty liability of TSE.

## APPEAL OF BANKRUPTCY COURT'S ACTION IN APPROVING SETTLEMENT BETWEEN TRUSTEE AND MURPHY INTERESTS

26

[¶88]   Murphy Brothers ("Murphy") filed a proof of claim for $2,574,340.00 in this bankruptcy case. The claim stemmed from a loan agreement and two promissory notes given by TSE, one for $2,100,000.00 and one for $380,000.00. White Rock Pipeline, LLC ("White Rock"), a South Dakota limited liability company, had constructed a pipeline to the TSE plant. Murphy had financed this activity. TSE owned 51% of White Rock and the others, namely Murphy, Walter Woods, and Randy Kramer owned 49% collectively.

[¶89]   TSE was required by a federal regulatory agency to acquire 100% ownership of White Rock. Money from Murphy made this possible. TSE did acquire such ownership and defaulted on its monetary obligations to Murphy.

[¶90]   In February of 2005, trustee paid Murphy, with court approval, $1,986,000.00. In August of 2005, Murphy filed an amended proof of claim. Trustee and Murphy thereafter reached a settlement and the trustee presented it to the bankruptcy judge, seeking approval. TSF filed objections. An evidentiary hearing was scheduled but was cancelled based upon the agreement of all concerned to submit the motion on written evidence. On January 22, 2007, the bankruptcy court approved the settlement, issued a "letter decision" and supporting Order, and overruled the objections of TSF. TSF appealed. TSF raises a large number of questions on appeal, without suggesting answers to any of them. It is clear also that the trustee did not withhold any information from TSF but attempted to answer all questions and provide all requested documents.

[¶91]   Approval of a settlement by the bankruptcy court should not be set aside unless there is plain error or abuse of discretion. In re New Concept Housing, Inc., 951 F.2d 932, 939 (8th Cir. 1991), *citing* Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 571 (5th Cir.1960). The bankruptcy court should not substitute its judgment for that of the trustee. Martin v. Cox (In re Martin), 212 B.R. 316, 319 (BAP 8th Cir. 1988), *citing* Fed.R.Bankr.P. 8013 and First Nat'l Bank of Olathe Kansas v. Pontow, 111 F.3d 604, 609 (8th Cir.1997). There are four well known factors to be considered when looking at a proposed settlement. These include (1) the probability of success in the litigation, (2) the difficulties, if any, to be encountered in the matter of collection, (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it, and (4)

27

the paramount interest of creditors and a proper deference to their reasonable views in the premises. PW Enterprises, Inc. v. Kaler (In re Racing Services, Inc.), 332 B.R. 581, 586 (BAP 8th Cir. 2005) (*quoting* Drexel Burnham Lambert, Inc. v. Flight Transportation Corp. (In re Flight Transportation Corp. Securities Litigation), 730 F.2d 1128, 1135 (8th Cir. 1984) (*citing* Drexel v. Loomis, 35 F.2d 800, 806 (8th Cir. 1929)).

[¶92]  It is clear that the bankruptcy judge carefully considered the four factors set forth above. The lower court carefully examined the loan agreement, promissory notes, security agreement, transfers of ownership documents, disbursement agreement, and the proposed settlement itself. All the agreements and documents when the financing arrangement was first "put together" were part of the same transaction. The arguments of TSF to the contrary frankly make no sense.

[¶93]  It is clear that Murphy was entitled to be paid all principal and interest due under the promissory notes and that TSE was long in default. Such obligations were not executory or contingent. As to the basic ingredients, Murphy had the probability of success in any litigation. This is the first factor. As to the second factor, there was no difficulty in collecting. Murphy was an over-secured creditor. As to the third factor, this would be the "driving force" behind the settlement, just as it is in the vast majority of cases that are settled. It is obvious that expenses and delays involved in litigation would be important considerations. As to the fourth factor, no creditor other than TSF has objected. The paramount interests of the creditors have been fully considered.

[¶94]  In examining a proposed settlement, the bankruptcy court need not conclusively determine claims and need not have all the information necessary to resolve any factual dispute; if the bankruptcy court set out to resolve any factual dispute, there would be no point to the settlement. Martin, 212 B.R. 319. Likewise, there is no need for the court to find that the settlement is the best result that can be obtained. *Id.* The court need only canvass the issues to determine that the proposed settlement does not fall "below the lowest point of reasonableness." *Id.*

[¶95]  Looking at the brief filed by TSF in this appeal (CIV 07-1003), it would appear that TSF used the appeal of the Murphy matter (and other appeals) to more than extensively brief

28

the questions involving the recusal motion. This allows an "end run" on the page limitations of briefs in the District of South Dakota. Taking multiple appeals of multiple issues would apparently allow this but I do not approve of the tactics.

[¶96]   I reject again the contention of TSF that the bankruptcy judge should not have decided the "Murphy matter" and should have recused.

[¶97]   TSF argues that the bankruptcy judge gave "boilerplate approval" to the Murphy-trustee settlement. I disagree with that claim. In reading the letter opinion, it is obvious that the judge gave very careful and detailed attention to the proposed settlement. He certainly considered also all claims and objections raised by TSF.

[¶98]   The parties argue a great deal about the significance of two exhibits from the bankruptcy court. Exhibit four (to which TSF had no objection) would tell us that the trustee compromised the Murphy claim of $964,793.13 down to $850,000.00. Revised exhibit four (to which TSF objected) presents a $60,000.00 disparity and was a matter of legitimate concern for the bankruptcy court. The lower court found and concluded, however, that even with the disparity, the proposed settlement was not unreasonable. I am unable to find that the bankruptcy court abused its discretion or committed error. Certainly, the trustee could have possibly achieved a better settlement but that is not the test.

[¶99]   But for the proposed settlement, Murphy could have claimed pre-petition and post-petition attorney fees (the latter being pursuant to 11 U.S.C. § 506), prepayment penalties of $200,000.00 pursuant to the terms of the $2,100,000.00 promissory note, and additional interest from November 30, 2005. Litigation on questions of interest calculations, credits, validity of late charges, reasonable attorney fees, and prepayment penalties would have been complicated and protracted. Both the trustee and Murphy wished to avoid all of this. The settlement as approved by the bankruptcy court was clearly within the range of reason and was appropriate.

[¶100] All requests for oral argument should be rejected. This case has been argued and "briefed to death."

## ORDER

[¶101]Now, therefore,

[¶102]IT IS ORDERED AND ADJUDGED, as follows:

    1) All requests for oral argument are denied.

    2) The order denying recusal is affirmed.

    3) The order transferring case for purpose of ruling on motion for leave to take deposition is affirmed.

    4) The order denying motion to take deposition (of the trustee) is affirmed.

    5) The order denying motion to reconsider, set aside, alter and/or (sic) amend orders is affirmed.

    6) The order striking motion to reconsider, set aside, alter and/or (sic) amend orders is affirmed.

    7) The order setting deadlines is affirmed.

    8) The order approving fees of the trustee's attorney is affirmed.

    9) The order allowing the recovery by First Dakota National Bank of a prepayment penalty is reversed and this matter is remanded to the bankruptcy court to proceed pursuant to the order and opinion of this court as set forth above.

    10) The cross appeal by First Dakota National Bank is denied.

    11) The order approving the Murphy-Trustee settlement is affirmed.

[¶103]Dated this 17th day of May, 2007.

                    BY THE COURT:

                    CHARLES B. KORNMANN
                    UNITED STATES DISTRICT JUDGE

ATTEST:

JOSEPH HAAS, CLERK
BY:                        DEPUTY
        (SEAL)